2022R00904/MKN.CS

**RECEIVED**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JUN 06 2023

AT 8:30 _____ 1:24 PM
CLERK, U.S. DISTRICT COURT - DNJ

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Georgette Castner |
| | : | |
| | : | Criminal Number: 3:23-CR-541 |
| v. | : | |
| | : | 15 U.S.C. §§ 78j(b), 78ff(a); |
| | : | and 17 C.F.R. § 240.10b-5 |
| | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 1014 |
| CAZ CRAFFY, | : | 18 U.S.C. § 208 |
| a/k/a "CARZ CRAFFEY" | : | 18 U.S.C. § 1001 |
| | : | 18 U.S.C. § 2 |

### I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Trenton,

charges:

### COUNTS ONE THROUGH SIX
(Wire Fraud)

### Background and Relevant Parties

1.      At all times relevant to this Indictment:

*Individuals and Entities*

a.      Defendant CAZ CRAFFY, a/k/a "CARZ CRAFFEY" ("CRAFFY")

was a resident of New Jersey and a civilian employee of the United States Army at

Joint Base McGuire-Dix-Lakehurst, located in Ocean and Burlington Counties, New

Jersey.   CRAFFY worked as a Financial Counselor in the U.S. Army's Survivor

Outreach Services ("SOS"), a program overseen by the Casualty Assistance Office

("CAO") that provided long-term support to families of fallen servicemembers, known

as Gold Star Families. CRAFFY was also a Major in the United States Army Reserves.

b.    At the same time, CRAFFY also worked for two private financial firms, Financial Firm-1 and Financial Firm-2 (collectively, the "Financial Firms"), without disclosing that to the U.S. Army.

c.    Financial Firm-1 was a financial planning/investment firm headquartered in Boca Raton, Florida.  From in or around May 2017 through in or around March 2021, CRAFFY worked for Financial Firm-1 as a financial professional registered with the Financial Industry Regulatory Authority ("FINRA"), a government-authorized not-for-profit organization that oversees U.S. broker-dealers. Financial Firm-1's policies prohibited discretionary investment accounts—that is, accounts in which financial professionals are permitted to execute individual trades without the investor's approval for each trade—unless an investor provided authorization in writing.

d.    Financial Firm-2 was a broker-dealer and financial planning firm headquartered in Point Pleasant Beach, New Jersey.  From in or around April 2021 through in or around November 2022, CRAFFY worked for Financial Firm-2 as a financial professional registered with FINRA.  Financial Firm-2's policies prohibited all discretionary investment accounts, requiring that the financial professionals employed there seek client approval prior to executing each trade.

e.    As a financial advisor registered with FINRA, CRAFFY had a duty to act in the best interest of the people he advised.  CRAFFY also held North

American Securities Administrators Association Series 63 and FINRA Series 7 licenses, permitting him to trade in securities. In order to obtain Series 63 and Series 7 licenses, CRAFFY was required to have passed examinations establishing his knowledge regarding, among other things, his duties and responsibilities as a fiduciary.

       f.     The Financial Firms each paid CRAFFY commissions that were tied to the size and/or volume of the securities trades that he caused to be executed, regardless of whether those trades were profitable for the people CRAFFY was advising. Those commissions were paid out of the accounts of the people on whose behalf CRAFFY made trades.

       g.     The Financial Firms both used a trade clearing firm based in Nebraska ("Clearing House-1") as the clearing house for executed trades. Clearing House-1's servers were located outside of New Jersey.

       h.     Financial Firm-2 used a trade platform located in Wisconsin ("Trade Platform-1"), to execute all orders to buy and sell securities. Trade Platform-1's servers were located outside of New Jersey.

*Gold Star Families and Survivor Benefits*

       i.     When an active-duty servicemember died, the military branch in which that servicemember served provided services and financial assistance, known as survivor benefits, to the Gold Star Family. These benefits included a $100,000 payment from the U.S. Military to the servicemember's surviving beneficiary within approximately two weeks of the servicemembers' death. Additionally, within several

months of the servicemember's death, the Military provided up to $400,000 in life insurance benefits to beneficiaries of servicemembers who were enrolled in the Servicemembers Group Life Insurance program ("SGLI").

j.      In the U.S. Army, the CAO administered these survivor benefits. This included assigning a Financial Counselor, like CRAFFY, who was available to provide Gold Star Families basic financial information and education regarding, among other things, survivor benefits, budgeting, college savings plans, health care, insurance options, and retirement planning options.

k.      As described in the SOS Operations Manual, Financial Counselors are expected to provide "assistance to Survivors through financial education." Further, the Financial Counselors "should only provide information and not offer any personal opinions regarding Survivor's benefits decisions."

l.      The SOS Operations Manual explicitly states that Financial Counselors must adhere to the Joint Ethics Regulations, as outlined in DoD 5500.7-R. These regulations make clear that, among other things, "[e]mployees shall not hold financial interests that conflict with the conscientious performance of duty," and that "[e]mployees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest." 5 C.F.R., Part 2635.

### The Scheme to Defraud

2.      From in or around May 2018 through in or around January 2023, in

4

Ocean and Burlington Counties, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud Gold Star Family members, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations, and promises, including but not limited to the concealment of material facts, as set forth below.

### Goal of the Scheme to Defraud

3.     The goal of the scheme was for CRAFFY to enrich himself by misrepresenting the scope of his responsibilities as a U.S. Army Financial Counselor and fraudulently inducing Gold Star Families to invest their survivor benefits in brokerage accounts that CRAFFY managed and controlled. CRAFFY then executed hundreds of unauthorized securities trades with those funds, out of which CRAFFY received lucrative commissions, regardless of whether those trades resulted in substantial losses to the Gold Star Family members whose money he purported to manage.

### Manner and Means of the Scheme to Defraud

4.     It was part of the scheme to defraud that:

***CRAFFY Fraudulently Induced Victim Families to Invest with Him***

a.     As a Financial Counselor in the CAO, CRAFFY knew that Gold Star Family members received survivor benefits following the death of a

5

servicemember.  In some instances, the U.S. Army assigned CRAFFY to work with specific families.  In other instances, CRAFFY used his position to access internal military databases to target and contact these Gold Star Families and other military personnel who had recently lost loved ones (the "Victim Families" or "Victim Family").

b.    Prior to opening a customer account, securities firms ordinarily seek basic information regarding a potential customer's investment strategy and knowledge. Such information allows the company to determine whether risky investments are suitable to the client's overall goals and profile. Most of the Victim Families CRAFFY contacted told CRAFFY that they had limited investment experience and generally wanted to invest their survivor benefits conservatively, including investing in retirement accounts and college savings plans.

c.    CRAFFY, who was not authorized by the U.S. Army to offer any opinions regarding investment decisions, encouraged the Victim Families to invest their survivor benefits in investment accounts held by the Financial Firms.  During these discussions, CRAFFY concealed and failed to disclose that he worked for the Financial Firms separate from the U.S. Army and without the U.S. Army's knowledge or authorization.

d.    In addition, CRAFFY concealed and failed to disclose to the Victim Families the material facts that:

i.    the U.S. Army had no affiliation with and did not endorse the Financial Firms;

ii.    the U.S. Army did not know about or sanction any

6

investments through CRAFFY or the Financial Firms;

iii.    CRAFFY received commissions for making trades in customer accounts at the Financial Firms, which would be paid out of the money invested; and

iv.    the U.S. Army prohibited CRAFFY, as a Financial Counselor, from recommending specific investment vehicles, making trades, or opining to Victim Families on how they should use their survivor benefits.

e.    Based on these and other false and misleading affirmative representations and omissions, CRAFFY caused approximately 29 individuals associated with the Victim Families to transfer a total of approximately $9,900,000 in survivor benefits to accounts CRAFFY controlled at the Financial Firms (the "Victim Family Accounts").

### *CRAFFY Fraudulently Used Victim Funds to Enrich Himself*

f.    CRAFFY induced Victim Families to sign and return pre-filled account opening documents (the "Account Documents"), which, among other things, often overstated the Victim Families' net worth and falsely indicated that the Victim Families elected an "aggressive" investment strategy.  These false representations about the Victim Families' tolerance for risky investments allowed CRAFFY to use the trading accounts with little oversight from the Financial Firms.

g.    Despite the Financial Firms' policies requiring investor approval for each trade, CRAFFY routinely failed to obtain such approval before causing the execution of trades.  Nonetheless, CRAFFY often caused trading records to falsely

state that these trades were "solicited" from, or recommended to, the Victim Families.

h.  By causing these frequent and unauthorized trades using the Victim Families' money, CRAFFY earned lucrative commissions for himself, regardless of whether those trades resulted in profits or losses for the Victim Families.  For example, on or about January 14, 2022, one of the Victim Families ("Victim Family-1") opened an account with CRAFFY, investing $500,000 in survivor benefits.  On or about January 18, 2022, CRAFFY purchased stock in four individual companies for a total of approximately $287,000—more than 55% of the account.  On or about January 27, 2022, just nine days later, CRAFFY sold those four companies' stock, each at significantly lower prices than he had purchased them.  As a result of those trades, Victim Family-1 account lost approximately $49,000 in value; on those same trades, CRAFFY received total commissions of approximately $8,900, all funded by the Victim Family-1 account.

i.  From in or around May 2018 to in or around January 2023, as a result of CRAFFY's unauthorized trading activities, the Victim Family Accounts decreased in value by more than approximately $3.4 million, as a result of both market losses and commissions paid.  CRAFFY personally earned approximately $1.4 million in commissions, paid out of the invested funds, from executing trades in the Victim Family Accounts.

j.  When the Victim Families questioned CRAFFY about their investments or account status, CRAFFY often encouraged them not to check their account statements, and provided myriad excuses for the poor financial performance

of their investments, including the effects of the COVID-19 pandemic, the ongoing war in the Ukraine, and inflation generally.

5.      CRAFFY also concealed his scheme from the U.S. Army by, among other things, failing to report his work with the Financial Firms on a government form used to identify potential conflicts between official duties and private financial interests or affiliations.   Specifically, on or about June 17, 2022, as part of his U.S. Army employment, CRAFFY signed and submitted a U.S. Office of Government Ethics ("OGE") Form 450, on which he falsely omitted his outside employment at the Financial Firms, his compensation from those firms, and his trading activities using the Victim Families' money.

### CRAFFY's Victims Included Two Gold Star Family Widows

As part of the scheme, CRAFFY made fraudulent misrepresentations and omissions to two Gold Star Family widows, resulting in financial losses to both of them.

### *Widow-1*

6.      On or about December 29, 2020, Servicemember-1 died while serving in the U.S. Army and stationed at the U.S. Military Academy at West Point in New York State.   Shortly after Servicemember-1's death, CRAFFY contacted Servicemember-1's widow ("Widow-1"), who resided in New York.   CRAFFY spoke with Widow-1 and visited her home several times to discuss her survivor benefits.   Widow-1 advised CRAFFY that she wanted to open accounts for herself and her minor stepchildren that would focus on a low-risk and longer-term growth strategy.

7.     During their discussions, CRAFFY, in substance, touted his success in managing trading accounts and represented to Widow-1 and her family that he was a fiduciary acting on their behalf.  However, CRAFFY concealed, by failing to disclose to Widow-1 that, among other things:

a.     the U.S. Army did not know that CRAFFY also worked for the Financial Firms, which were unaffiliated with the U.S. Army;

b.     The U.S. Army did not sanction any investments through the Financial Firms or CRAFFY;

c.     CRAFFY received financial compensation and commissions as a result of managing the accounts at the Financial Firms out of the funds invested with him; and

d.     in his role as a Financial Counselor for the U.S. Army, CRAFFY was only permitted to provide Widow-1 general financial education and was prohibited from opining on her decision regarding survivor benefits.

8.     These affirmative misrepresentations and concealment by omissions (a) caused Widow-1 to believe that the U.S. Army provided and authorized CRAFFY's investment services, and (b) induced Widow-1 to transfer approximately $370,000 in survivor benefits into trading accounts that CRAFFY controlled.  Widow-1 made those payments by three separate checks on or about the following dates, which CRAFFY caused to be scanned and sent via interstate wire from Firm-2 to Clearing House-1 on or about the following dates:

| | | |
|---|---|---|
| July 19, 2021 | $290,000 | July 23, 2021 |
| August 16, 2021 | $40,000 | August 20, 2021 |
| August 16, 2021 | $40,000 | August 20, 2021 |

9.    In or around July and August 2021, CRAFFY also caused Widow-1 to sign pre-filled documents, each titled "Account Application and Agreement" (the "Agreements"), which contained several knowingly false statements, including that:

a.    Widow-1's net worth was approximately $1.1 million;

b.    Widow-1's investment "Risk Tolerance" was "Aggressive" and her investment objective was "Maximum Growth" and "with higher risk"; and

c.    Widow-1's "Investment Knowledge" was "Good," with over five years of investment experience in trading individual stocks.

10.    When CRAFFY caused Widow-1 to sign these Agreements, CRAFFY knew that all of the claims listed above were false.

11.    CRAFFY did not obtain Widow-1's permission to trade in her or her stepchildren's accounts.  For example, on or about November 19, 2021, using one of Widow-1's accounts and without Widow-1's prior approval, CRAFFY purchased approximately 2,500 shares of Company-1 stock for approximately $131,200.  Widow-1 did not know about or approve this stock purchase, which CRAFFY executed on or about the same day that Company-1's stock was trading at the highest price in the history of the company.  The price of Company-1's stock has since declined by approximately 88%, causing financial losses to Widow-1.  Nonetheless, as a result of

11

that trade, CRAFFY received a commission from Financial Firm-2 of approximately $2,525.

12.     During the scheme, Widow-1 did not realize the financial losses she was suffering because CRAFFY advised her not to look at her account statements.

13.     CRAFFY's scheme resulted in Widow-1's account decreasing in value by approximately $207,000, due to market losses and the payment of approximately $84,000 in commissions to CRAFFY.

### *Widow-2*

14.     In or around April 2019, Servicemember-2 died while serving in the U.S. Army at Fort Carson, Colorado.  Approximately one month later, Servicemember-2's widow ("Widow-2") relocated to New Jersey, and the U.S. Army subsequently assigned CRAFFY to provide Widow-2 basic financial information and education regarding survivor benefits.

15.     CRAFFY described himself to Widow-2 as her "wealth manager" rather than a Financial Counselor, and he told Widow-2, in substance, that:

a.     although many surviving military spouses purchased homes with their survivor benefits, because they were unable to pay taxes and other expenses associated with the home purchases, she should instead invest in stocks, which he could invest for her;

b.     with a $400,000 investment, she could expect $500,000 to $600,000 in growth over ten years; and

c.     in approximately seven years' time, she could expect to have a net

worth of $1,000,000.

16.     Widow-2 told CRAFFY that she wanted the money to be invested conservatively in a retirement account for her mother and for her children's future college expenses.

17.     CRAFFY did not provide Widow-2 with alternative options for investing her survivor benefits, and he failed to disclose to her the same information that he failed to disclose to Widow-1, discussed in Paragraph 7, above.

18.     These affirmative misrepresentations and concealment by omissions (a) caused Widow-2 to believe that the U.S. Army provided and authorized CRAFFY's investment services, and (b) induced Widow-2 to transfer survivor benefits into trading accounts that CRAFFY controlled.  Specifically, on or about August 5, 2019, Widow-2 gave CRAFFY a check for approximately $400,081.94.  On or about August 9, 2019, CRAFFY, through Financial Firm-1, caused the check to be scanned and sent via interstate wire to Clearing House-1.

19.     On or before May 21, 2021, CRAFFY caused Widow-2 to sign a pre-filled "Account Application and Agreement," which, unbeknownst to Widow-2, contained several false statements that, among other things, overinflated her net worth and investment risk tolerance.

20.     CRAFFY subsequently executed trades using Widow-2's trading account without her permission.  For example, on or about November 19, 2021, without Widow-2's knowledge or authorization, CRAFFY purchased approximately 1,700 shares of Company-1 for approximately $90,574.  CRAFFY executed this trade on or

about the same day that Company-1's stock was trading at an all-time high, eventually causing losses to Widow-2.   CRAFFY received a commission of approximately $2,200 for that stock trade.

21.   CRAFFY's scheme resulted in Widow-2's account decreasing in value by approximately $242,000, due to market losses and the payment of approximately $73,800 in commissions to and received by CRAFFY out of Widow-2's account.

### Execution of the Scheme

22.   On or about the dates set forth below, for the purpose of executing and attempting to execute the scheme and artifice to defraud, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

knowingly transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, each constituting a separate count of this Indictment:

| Count | Approximate Date | Description |
|---|---|---|
| One | August 9, 2019 | CRAFFY caused an interstate wire of approximately $400,081.94 to be sent to Clearing House-1. |
| Two | July 23, 2021 | CRAFFY caused an interstate wire of approximately $290,000 to be sent to Clearing House-1. |

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| Three | August 20, 2021 | CRAFFY caused an interstate wire of approximately $40,000 to be sent to Clearing House-1. |
| Four | August 20, 2021 | CRAFFY caused an interstate wire of approximately $40,000 to be sent to Clearing House-1. |
| Five | November 19, 2021 | CRAFFY caused a stock purchase via interstate wire using Widow-1's trading account. |
| Six | November 19, 2021 | CRAFFY caused a stock purchase via interstate wire using Widow-2's trading account. |

In violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT SEVEN
(Securities Fraud)

1.    The allegations in Paragraphs 1 and 3 through 21 of Counts One through Six of this Indictment are realleged here.

2.    From at least as early as in or around May 2018 through in or around January 2023, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, CAZ CRAFFY, a/k/a CARZ CRAFFEY, engaged in a scheme to commit securities fraud regarding the Victim Family Accounts at the Financial Firms.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

16

## COUNT EIGHT
### (False Statement on Loan Application)

1.     The allegations in Paragraphs 1 and 3 through 21 of Counts One through Six of this Indictment are realleged here.

### Background

2.     Widow-3 was a resident of New Jersey.

3.     Property-1 was CRAFFY's home in Colts Neck, New Jersey, which he purchased on or about April 8, 2022.

4.     Mortgage Company-1 was a mortgage lending company located in Ocean Township, New Jersey that provided mortgage lending services to CRAFFY for the purchase of Property-1.

5.     When a person buying a home received an influx of cash to use as a down payment, lenders such as Mortgage Company-1 often required a "Gift Letter" certifying that the cash was a gift and not an undisclosed loan.

6.     Bank-1 was a bank headquartered in Michigan, with deposits insured by the Federal Deposit Insurance Corporation.  On or about June 1, 2022, Bank-1 assumed the loan for Property-1.

### The False Statements

7.     In or around February 2021, CRAFFY met with Widow-3 shortly after her ex-husband died while serving in the U. S. Army at Fort Hood in Killeen, Texas. In or around July 2021, Widow-3 invested with CRAFFY approximately $350,000 of the survivor benefits granted to her children as a result of her ex-husband

17

servicemember's death.

8.    In or around March 2022, CRAFFY asked Widow-3 for a loan to help him secure a mortgage loan on Property-1—a $2.1 million home he sought to purchase.  CRAFFY explained to Widow-3, in substance, that the loan needed to appear to be a gift for purposes of the mortgage application.

9.    On or about March 21 and 22, 2022, CRAFFY and Widow-3 exchanged text messages about CRAFFY borrowing money from the retirement account belonging to Widow-3's daughter ("Victim Daughter").  When Widow-3 expressed concerns about recovering the money, CRAFFY reassured her via text message that he would repay the loan within "6 months or less."

10.    On or about March 23, 2022, Widow-3 wrote two checks to CRAFFY, one for approximately $85,000 and the other for approximately $50,000.  The memo line of both checks falsely read, "GIFT."

11.    On or about the same day, CRAFFY caused Widow-3 to complete and sign "Gift Letters" from Mortgage Company-1 for each check.  Each letter contained false statements, including: (a) Widow-3's certification that she intended to give CRAFFY gifts of $85,000 and $50,000 "to be used for the purchase of [Property-1]"; (b) that each check was "an outright gift" that did "not have to be repaid"; and (c) that Widow-3 was CRAFFY's cousin.  On or about March 23, 2022, CRAFFY also signed the Gift Letters.

12.    CRAFFY subsequently caused the Gift Letters to be submitted to Mortgage Company-1, and ultimately, on or before June 1, 2022, to Bank-1.  In

reliance on the Gift Letters and other information, Mortgage Company-1 approved CRAFFY for a mortgage loan of approximately $2,100,000.

13.     In or around September 2022, CRAFFY partially repaid Widow-3 for the loan.

14.     From on or about March 23, 2022 to on or about June 1, 2022, in Monmouth County, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

did knowingly make and cause to be made false statements to Mortgage Company-1, a mortgage lending business, and Bank-1, an institution insured by the Federal Deposit Insurance Corporation, for the purpose of influencing the action of both Mortgage Company-1 and Bank-1, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, in that the defendant submitted and caused to be submitted letters stating that money he received from Widow-3 was a gift, when in fact, CRAFFY knew the money was a loan that CRAFFY agreed to repay.

In violation of Title 18, United States Code, Section 1014 and Section 2.

19

## COUNT NINE
(Acts Affecting Personal Financial Interests)

1.      The allegations in Paragraphs 1 and 3 through 21 of Counts One through Six, and Paragraphs 2 through 13 of Count Eight of this Indictment are realleged here.

2.      Beginning at least as early as in or around May 2018 through in or around January 2023, in Ocean and Burlington Counties, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

being an officer and employee of the United States Army, knowingly and willfully participated personally and substantially as a Government officer and employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, and otherwise, in a proceeding, application, request for a ruling and other determination, contract, claim, controversy, charge, accusation, arrest, and other particular matter in which, to his knowledge, he had a financial interest.

In violation of Title 18, United States Code, Section 208(a).

## COUNT TEN
(False Statements)

1.      The allegations set forth in Paragraphs 1 and 5 of Counts One through Six of this Indictment are realleged here.

2.      On or about June 17, 2022, in Ocean and Burlington Counties, in the District of New Jersey and elsewhere, the defendant,

CAZ CRAFFY,
a/k/a "CARZ CRAFFEY,"

in a matter within the jurisdiction of the executive branch of the United States Government, that is the Department of the United States Army, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, and falsified, concealed, and covered up by trick, scheme, and device, certain material facts on an OGE Form 450, filed with the United States Office of Government Ethics.

In violation of Title 18, United States Code, Section 1001.

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH SEVEN

1.      As a result of committing the offenses charged in Counts One through Seven of this Indictment, defendant CAZ CRAFFY, a/k/a "CARZ CRAFFEY," shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting or derived from proceeds traceable to the offenses alleged in Counts One through Seven of this Indictment.

## FORFEITURE ALLEGATION AS TO COUNT EIGHT

2.      As a result of committing the offense charged in Count Eight of this Indictment, defendant CAZ CRAFFY, a/k/a "CARZ CRAFFEY," shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of the offense charged in Count Eight of this Indictment.

### Substitute Assets Provision
(Applicable to all Forfeiture Allegations)

3.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third person;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be
        subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,
Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to
seek forfeiture of any other property of the defendant up to the value of the above
forfeitable property.

A True Bill

Foreperson

PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 23-541 (GC)_____

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## CAZ CRAFFY
## a/k/a "CARZ CRAFFEY"

# INDICTMENT FOR

15 U.S.C. §§ 78j(b), 78ff(a);
and 17 C.F.R. § 240.10b-5
18 U.S.C. § 1343
18 U.S.C. § 1014
18 U.S.C. § 208
18 U.S.C. § 1001
18 U.S.C. § 2

A True Bill,

Foreperson

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

AUSA MARTHA K. NYE
AUSA CAROLYN SILANE
ASSISTANT U.S. ATTORNEYS
TRENTON, NEW JERSEY
609-989-0579